WMP:PEN
F#2012R00973

1 3 M 4 1 8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

MIKHAIL L. PRESMAN,

         Defendant.

- - - - - - - - - - - - - - -X

- - - - - - - - - - - - - - -X

IN MATTER OF THE SEARCH OF THE
PREMISES KNOWN AND DESCRIBED AS
29 VAN SICKLEN STREET, APARTMENT
3A, WHICH OCCUPIES THE TOP TWO
FLOORS OF A FIVE-STORY BUILDING
AND WHICH INCLUDES A ROOF DECK
AND A BASEMENT STORAGE UNIT THAT
IS ASSIGNED TO APARTMENT 3A.

- - - - - - - - - - - - - - -X

**TO BE FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR AN
ARREST WARRANT

(18 U.S.C. § 1347)

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR A
SEARCH WARRANT
(18 U.S.C. § 1347)

EASTERN DISTRICT OF NEW YORK, ss:

        VITALY ZUBRY, being duly sworn, deposes and states that

he is a Special Agent with the Office of Inspector General of the

Department of Health and Human Services ("HHS-OIG"), duly

appointed according to law and acting as such.

        Upon information and belief, on or about and between

January 1, 2006 through May 10, 2013, within the Eastern District

of New York and elsewhere, the defendant MIKHAIL L. PRESMAN,
together with others, did knowingly and willfully execute and
attempt to execute a scheme and artifice to defraud Medicare, and
to obtain, by means of materially false and fraudulent pretenses,
representations and promises, money and property owned by, and
under the custody and control of, Medicare, in connection with
the delivery of and payment for health care benefits, items, and
services.

(Title 18, United States Code, Section 1347)

Upon information and belief, there is probable cause to
believe that there are kept and concealed within the premises
known and described as 29 VAN SICKLEN STREET, APARTMENT 3A, A
TWO-STORY, FOUR BEDROOM APARTMENT, WHICH OCCUPIES THE TOP TWO
FLOORS OF A FIVE-STORIED BUILDING AND WHICH INCLUDES A ROOF DECK
AND A BASEMENT STORAGE UNIT THAT IS ASSIGNED TO APARTMENT 3A
("SUBJECT PREMISES"), property, as described on Exhibit A
(attached hereto and incorporated herein), and other items, all
of which constitute evidence, fruits and instrumentalities of
violations of federal law, including violations of Title 18,
United States Code, Section 1347 (health care fraud) (the
"SUBJECT OFFENSE").

The source of your affiant's information and the
grounds for his belief are as follows:

1.    I have been an HHS Special Agent since 2011.
During my tenure with HHS, I have participated in a variety of
criminal health care fraud investigations, during the course of
which I have interviewed witnesses, conducted physical
surveillances, executed search warrants, and reviewed health care
claims data, bank records, telephone records, medical records,
invoices, and other business records.  I am familiar with the
records and documents maintained by health care providers and the
laws and regulations related to the administration of the
Medicare and Medicaid programs and other health care benefit
programs.  I currently am assigned to investigate health care
fraud violations, including schemes to defraud the Medicare
program.

2.    I have personally participated in the
investigation of the offenses discussed below.  I am familiar
with the facts and circumstances of this investigation from: (a)
my personal participation in this investigation, (b) reports made
to me by other law enforcement authorities, and (c) information
obtained from witnesses.

3.    Except as explicitly set forth below, I have not
distinguished in this affidavit between facts of which I have
personal knowledge and facts of which I have hearsay knowledge.
Because this affidavit is being submitted for the limited purpose

of establishing probable cause for the issuance of an arrest warrant for the defendant MIKHAIL S. PRESMAN, and search warrant for the SUBJECT PREMISES, I have not set forth each and every fact learned during the course of this investigation.  Instead, I have set forth only those facts, in substance and in pertinent part, which I believe are necessary to establish probable cause for the issuance of an arrest and search warrant.

### THE MEDICARE PROGRAM

4.    The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were over the age of 65 or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

5.    Medicare was a "health care benefit program," as defined by title 18, United states Code, Section 24(b).

6.    Medicare included coverage under two primary components, hospital insurance ("Part A") and medical insurance (Part "B").  Generally, Medicare Part B covered these costs if, among other requirements, they were medically necessary and ordered by a physician.

7.    A physician or medical clinic that sought to participate in Medicare was required to apply for and receive a provider identification number ("PIN") or provider transaction access number ("PTAN").  The PIN/PTAN allowed a physician or medical clinic to submit bills, known as "claims," to Medicare to obtain reimbursement for the cost of treatment and related health care benefits, items, and services that they had supplied or provided to beneficiaries.

8.    Medical providers were authorized to submit claims to Medicare only for services they actually rendered and were required to maintain patient records verifying the provision of services.  By submitting the claim, either electronically or in writing, the provider was certifying, among other things, that the services that were rendered to the patient were medically necessary.

9.    Providers submitted to Medicare claims using billing codes, also called current procedural terminology or "CPT" codes, which were numbers referring to specific descriptions of the medical services provided to beneficiaries.

### THE DEFENDANT

10.   The investigation has revealed that between approximately January 1, 2006 and May 10, 2013, the defendant MIKHAIL L. PRESMAN was a licensed physician with a specialty in

6

psychiatry and a Medicare provider.  From at least 2006, PRESMAN
was a salaried employee of the United States Department Veterans
Affairs Administration ("VA") as a full-time psychiatrist at the
VA Hospital located at 800 Poly Place, Brooklyn, New York.
According to records obtained from the VA, PRESMAN's "core"
hours, or scheduled work hours, were from 8:00 a.m. until 4:30
p.m., weekdays.

11.    The defendant MIKHAIL L. PRESMAN submitted an
application to become a Medicare provider on May 5, 2004.  On his
registration statement, he designated his specialty as a
psychiatrist.  He also stated that his "practice location" and
residence was Apartment 3A of 29 Van Sicklen Street, Brooklyn,
New York, and that his patient records were kept and maintained
at that location.  He also indicated that he conducted home
medical visits.  This Medicare application was re-validated on
July 14, 2012.

<u>THE SUBJECT PREMISES</u>

12.    According to VA and DMV records, the defendant
MIKHAIL L. PRESMAN resides at 29 Van Sicklen Avenue, Apartment
3A, Brooklyn, New York.  I have conducted surveillance at 29 Van
Sicklen Avenue, Brooklyn, New York.  This premises is a multi-
family condominium building.  I obtained records from the New
York City ("NYC") Department of Finance, NYC Department of

Buildings and the New York State Attorney General's Office and
obtained a copy of the certificate of occupancy and condominium
plan for 29 Van Sicklen, Brooklyn, New York.  These plans
revealed that Van Sicklen Avenue is a five floor building labeled
the cellar, basement, first, second, and mezzanine floors.
Apartment 3A occupies the front part of the top two floors of the
western half of the building that faces Van Sicklen Avenue.  The
condominium plan states that Apartment 3A has access to a roof
deck and a cellar storage unit.

13.   The facade of 29 Van Sicklen Street has a buzzer
entry system.  "Presman 3A" was listed on the system's directory.
Also, PRESMAN's Medicare payments are addressed to 29 Van
Sicklen, Apartment 3A, Brooklyn, New York.

14.   During surveillance conducted at the VA Hospital
on several occasions during 2012, the defendant MIKHAIL L.
PRESMAN was observed leaving 29 Van Sicklen at approximately 7:30
a.m.  and leaving the VA Hospital between approximately 3:30 p.m.
and 4:00 p.m.  For the period August 2012 through November 2012,
evidence obtained from a pole camera located outside the SUBJECT
PREMISES showed that, on weekdays, PRESMAN generally drove away
from the SUBJECT PREMISES approximately between 7:15 a.m. and
7:30 a.m., arrived back at the SUBJECT PREMISES between

approximately 5:00 p.m. to 7:00 p.m., and did not leave for the rest of the evening.

### PROBABLE CAUSE

15.   A search of the Medicare claims submitted by the defendant MIKHAIL L. PRESMAN revealed that, between 2006 and 2012, PRESMAN submitted claims for home medical visits for substantially every day of the year -- seven days a week, 365 days a year.[1]  In total, PRESMAN submitted over $4,000,000 in Medicare claims and received Medicare payments of over $2,800,000.  Of these claims, 90% were billed under the CPT billing code 99349.  This is not a code for a psychiatric home visit; rather it is a code for medical home visit for "evaluation and management of an established patient."  The guideline for this code requires that, during these visits, a physician must have two of the following three components: (1) "detailed interval history," (2) "detailed examination" and (3) medical decision making of moderate complexity.  The guideline  provides that "[c]ounseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs."  Notably, the guideline also provides "usually, the presenting

---

[1]   In 2009, PRESMAN filed an application with Medicare to permit him to file his claims electronically.

problem(s) are moderate to high severity."  Physicians typically
spend 40 minutes face-to-face with the patient and/or family.[2]
Payment for this code is approximately $125.00.  Payment for a
parallel code for an approximate 40-minute psychiatric home visit
is approximately $60.00.

        16.  Although the defendant MIKHAIL L. PRESMAN has a
full-time, eight-hours-a-day, job with the VA, he submitted
claims in 2006, for an <u>average</u> of 7.25 patients daily; in 2007,
for an <u>average</u> of 11.55 patients daily; in 2008, for an average
of 13.92 patients daily; in 2009, for an <u>average</u> of 15.66
patients daily; in 2010, for an <u>average</u> of 14.57 patients daily;
and in 2011, for an <u>average</u> of 14.66 patients daily.[3]  Thus, on a
weekday in 2011, even if PRESMAN only spent 30 minutes with each
patient during a home visit, he would have spent seven hours a
day in patients' homes in addition to the eight hours he spent at
the VA.  This time commitment did not include the time he spent
parking his motor vehicle and traveling from patient to patient

---

[2] Code 99348 provides for an approximately 25-minute visit
for "expanded problem focused interval history" and examination
and medical decision making of a low complexity.  Code 99347
provides for an approximate 15-minute visit for "problem focused
interval history" and examination and straightforward medical
decision making.

[3] These claim numbers represent "unique" claims, meaning
claims for different patients and not multiple claims for a
single patient.

through traffic.   For Saturdays in 2011, the <u>average</u> numbers of patients for which he submitted claims was 23.22.   <u>See</u> Exhibit B (attached hereto and incorporated by reference).

      17.   Additionally, substantially all of the defendant MIKHAIL L. PRESMAN's patients were diagnosed with senile dementia, a condition which would not render itself conducive to "talk therapy" or lengthy visits by a psychiatrist.   On October 22, 2012, I interviewed Patient #1 and Patient #2, a husband and wife for whom the defendant PRESMAN submitted Medicare claims. Patients #1 and #2 spoke cogently and were mobile.   Patients #1 and #2 stated, in sum and substance, that they had a primary care physician who conducted a monthly home visit for a general check-up.   They further stated, in sum and substance, that PRESMAN, whom they identified in a photograph, conducted a home visit approximately every three months.   During the home visit, PRESMAN generally arrived between 4:00 p.m. and 5:00 p.m. and spoke to them simultaneously for approximately 30 minutes.   A review of the Medicare claims submitted for Patients #1 and #2 by PRESMAN revealed that PRESMAN diagnosed Patients #1 and #2 as being "senile depressive."   Moreover, PRESMAN submitted claims for each patient under code 99349, which, as mentioned above, is for visits lasting approximately 40 minutes.

18.   An analysis of the defendant MIKHAIL L. PRESMAN's Medicare claims further revealed that PRESMAN, for the most part, did not file claims contemporaneous to his alleged treatment of patients.   Instead, he generally filed claims for the treatment of multiple patients on the same day sequentially throughout the year.   For example, for the service date of January 1, 2011, PRESMAN submitted claims to Medicare for the treatment of 15 patients during a home visit.   However, for this treatment date, claims were submitted by PRESMAN for the treatment of the 15 patients on March 7, 2011 (2 claims), April 11, 2011 (1 claims), July 6, 2011 (5 claims), August 9, 2011 (1 claim), August 12, 2011 (5 claims) and November 23, 2011 (1 claim).

19.   An HHS audit also revealed that the defendant MIKHAIL L. PRESMAN submitted 55 Medicare claims for home medical visits between January 1, 2006 and September 30, 2012, for patients who were hospitalized during that time period.   For these 55 claims, Medicare paid PRESMAN a total of over $8,000.

20.   Moreover, the defendant MIKHAIL L. PRESMAN consistently submitted claims for performing medical home visits in New York while he was outside the New York area.   I obtained air travel records for PRESMAN.   For example:

(a) PRESMAN traveled to Peking, China, on September 4, 2007 and returned on September 15, 2007.   He submitted Medicare

claims for the treatment of 19 patients on September 5, 2007, 3
patients on September 13, 2007 and 25 patients on September 14,
2007.

(b) PRESMAN traveled to Madrid, Spain, on September 8,
2008 and returned on September 20, 2008.  He submitted Medicare
claims for the treatment of 21 patients on September 9, 2008, 20
patients on September 10, 2008, 27 patients on September 11,
2008, 2 patients on September 18, 2008 and 28 patients on
September 19, 2008.

(c) PRESMAN traveled to Punta Cana, Dominican Republic,
on April 20, 2009 and returned April 29, 2009.  He submitted
Medicare claims for the treatment of 4 patients on April 21,
2009, 26 patients on April 22, 2009, 1 patient on April 23, 2009,
14 patients on April 27, 2009 and 26 patients on April 28, 2009.

(d) PRESMAN traveled to Montego Bay, Jamaica, on
December 6, 2010 and returned on December 14, 2010.  He submitted
Medicare claims for the treatment of 20 patients on December 13,
2010.

(e) PRESMAN traveled to Los Angeles, California, on
September 15, 2011 and returned (via San Francisco) on September
25, 2011.  He submitted Medicare claims for the treatment of 14
patients on September 16, 2011, 15 patients on September 17,
2011, 24 patients on September 18, 2011, 2 patients on September

21, 2011, 1 patient on September 23, 2011 and 23 patients on September 24, 2011.

Although these claims did not total all of the claims that PRESMAN filed while he was out of the New York area, PRESMAN received in excess of $48,000 in Medicare payments for the aforementioned claims.

21.   Based upon my training and experience, as well as my investigation of this case, my review of Medicare claims as detailed in paragraphs 15 through 20 above, there is probable cause to believe that the defendant MIKHAIL L. PRESMAN engaged in indiscriminate billing practices that were based upon a pattern of diagnosis and treatment that was not reflective of the true nature and condition of his patients and filed claims based upon falsely inflated billing codes and non-existent medical care. This conclusion is corroborated by the fact that PRESMAN falsely submitted claims for medical home visits in New York, even though (a) he was out of New York, (b) he was out of the country and (c) the patients were hospitalized and incapable of receiving home medical treatment.

## BUSINESS RECORDS

22.   I have been informed by an Assistant U.S. Attorney that, under the relevant case law, in the event of a search of business premises that is "permeated with fraud," a broad search

warrant that authorizes the search and seizure of voluminous business records does not run afoul of the Fourth Amendment. National City Trading Corp. v. United States, 635 F.2d 1020, 1026 (2d Cir. 1980) (citing United States v. Brien, 617 F.2d 299, 309 (1st Cir. 1980)); see also United States v. Johnson, 108 F.3d 1370, 1997 WL 136332, at *3 (2d Cir. Mar. 21, 1997) (unpublished summary order) (affirming broad search where affidavit "show[ed] ample ground for finding pervasive fraud"). In this case, I have reviewed the defendant MIKHAIL PRESMAN'S bank accounts into which Medicare payments were deposited, along with deposits from Medicaid and private insurance companies. Medicare deposits represent approximately 80% of the total deposits into the account. This indicates that PRESMAN'S private medical practice is permeated with the Medicare fraud scheme detailed in paragraphs 12 through 21. Therefore a search of PRESMAN's files and records is justified.

23. Based on my knowledge, training and experience, and the experience of other law enforcement officers, I have knowledge of common business practices. In particular, I am aware that businesses routinely document and maintain records of their operating accounts - both in hard copy and electronically - including the receipt, expenditure and accounting of business funds. Businesses also maintain detailed records of their business activities, including with respect to vendors, customers, lenders

and employees. As such, there is probable cause to believe that there will be located at the SUBJECT PREMISES business records documenting interactions and communications regarding the fraudulent scheme.

24. Based on my knowledge, training, and experience, businesses billing Medicare also routinely maintain records of patient files, bills, invoices, and claims for payments/reimbursements for services billed, provided, or alleged to have been provided. Documents include reimbursement claim forms, explanations of medical benefits, detailed written orders or prescriptions, certificates of medical necessity, information from the treating physician concerning the patients' diagnosis, proof of delivery of services and/or items that were submitted by any representative acting on behalf of providers or for reimbursement by Medicare.

25. Medicare rules require that providers who file claims electronically maintain documents supporting their claims for several years after the claims are paid.

26. Based on my knowledge, training, and experience, businesses billing Medicare also retain contracts, agreements, papers, and affiliated records pertaining to the provision of diagnostic services, including manufacturer catalogs, purchase orders, invoices, and receipts.

27.   Based on my knowledge, training, and experience, businesses billing Medicare also retain letters relating to efforts to collect co-payments and deductibles from individuals that receive health care coverage from Medicare.   In addition, businesses retain correspondence and cancelled checks relating to notices of overpayment and requests for refunds from Medicare and Medicaid.  Businesses billing Medicare also have correspondence to and from Medicare including, but not limited to, audits (or audits from Medicare contractors), manuals, advisories, newsletters, bulletins, and publications.  Businesses also retain correspondence to and from patients regarding Medicare.

28.   Based on my knowledge, training, and experience, the financial books, records and documents constituting bank accounts, money market accounts, checking accounts, investment accounts, including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, credit card, ATM, and debit card accounts are also retained by businesses.

29.   Based on my knowledge, training, and experience, contracts, agreements, logs, lists or papers affiliated with any medical professional services, referrals, or storage, including records of payment, are also retained by businesses.

30.   Based on my knowledge, training, and experience,

17

medical providers often hire outside medical insurance billing companies. Therefore, all contracts, agreements, or paper affiliated with these companies are relevant.

### SPECIFICS REGARDING THE SEIZURE AND SEARCHING OF COMPUTER SYSTEMS FOUND ON THE SUBJECT PREMISES

31. Based on my training and experience, businesses often store documents on their computers that are relevant to investigate a fraud scheme. These documents include business plans, correspondence, spreadsheets of expenses and revenue, invoices and meeting minutes. There is probable cause to believe that computers at the SUBJECT PREMISES contain documents related to the fraudulent scheme to defraud Medicare.

32. Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including hard disk drives, floppy disks, compact disks, magnetic tapes, memory chips and other portable and removable media. I also know that during the search of the premises, it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process, which requires specific expertise and

specialized equipment.   There are so many types of computer
hardware and software in use today that it is impossible to bring
to the search site all of the necessary technical manuals and
specialized equipment necessary to conduct a thorough search.   In
addition, it may also be necessary to consult with computer
personnel who have specific expertise in the type of computer
software application or operating system that is being searched.

        b.   Searching computer systems requires the use of
precise, scientific procedures, which are designed to maintain the
integrity of the evidence and to recover "hidden," erased,
compressed, encrypted or password-protected data.   Computer
hardware and storage devices may contain "booby traps" that destroy
or alter data if certain procedures are not scrupulously followed.
Since computer data is particularly vulnerable to inadvertent or
intentional modification or destruction, a controlled environment,
such as a law enforcement laboratory, is essential to conducting a
complete and accurate analysis of the equipment and storage devices
from which the data will be extracted.

        c.   The volume of data stored on many computer
systems and storage devices will typically be so large that it will
be highly impractical to search for data during the execution of
the physical search of a premises.   A single megabyte of storage
space is the equivalent of 500 double-spaced pages of text.   A

single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 160 gigabytes ("GB") of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would result in a stack of paper over four miles high.

        d.   Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

e.    Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.

f.    In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or

viewed than on a particular user's operating system, storage capacity, and computer habits.

33. In light of these concerns, I hereby request the Court's permission to search, copy, image and seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the image or hardware for the evidence, fruits, and instrumentalities of violations of the specified SUBJECT OFFENSE.

## THE APPLICATION FOR A SEARCH WARRANT

34. Based on all of the foregoing facts, there is probable cause to believe that a search of the SUBJECT PREMISES will lead to the discovery of the items described in Exhibit A, which items constitute evidence, fruits and instrumentalities of the SUBJECT OFFENSES.

35. Based on the above information, there is probable cause to believe that the defendant MIKHAIL L. PRESMAN has committed the SUBJECT OFFENSE. Accordingly, I respectfully request that this Court issue a search warrant for the SUBJECT PREMISES, authorizing the seizure of the items described in Attachment A, and other items which constitute evidence, fruits and instrumentalities for the commission of the SUBJECT OFFENSE.

## CONCLUSION

WHEREFORE, I respectfully request that a warrant be issued for the arrest of the defendant MIKHAIL L. PRESMAN so that he may be dealt with according to law.

WHEREFORE, I further respectfully request that a warrant be issued authorizing the search of the SUBJECT PREMISES in accordance with the procedures detailed in paragraphs 22 through 33 and the seizure of property described in Exhibit A.

Furthermore, I respectfully request that this Court issue an Order sealing, until further order of this Court, all papers submitted in support of this Application, including this affidavit, arrest warrant and search warrant, and the requisite inventory notice (with the exception of one copy of the warrant and the inventory notice that will be left at the SUBJECT PREMISES). Sealing is necessary because the items and information to be seized are relevant to an ongoing

investigation, and premature disclosure of the contents of this Application and related documents may have a negative impact on this continuing investigation and may jeopardize its effectiveness.

Vitaly Zubry
Special Agent, HHS-OIG

Sworn to before me this
13th

THE
UNI'
EASTERN ---------- OF NEW YORK

## EXHIBIT A

## ITEMS TO BE SEIZED

All records relating to violations of Title 18, United States Code, Section 1347 involving the submission of Medicare claims between January 1, 2006 and May 10, 2013, including any and all of the following named records, documents, items and information, which may be may be stored or filed on a computer and includes any format in which the information may exist, including:

1.       Documents constituting, concerning, or relating to patient files, bills, invoices, and claims for payment/reimbursement for services billed, provided, or alleged to have been provided to patients to include, but not limited to, reimbursement claim forms (under Medicare), explanations of medical benefits, detailed written orders or prescriptions, certificates of medical necessity, information from the physician(s) concerning the patients' diagnosis, and proof of delivery of services and/or items that were submitted by any representative acting on behalf of providers or for reimbursement by Medicare.

2.       All contracts, agreements, papers, and affiliated records constituting, concerning, or relating to providing of medical treatment and diagnostic services by MIKHAIL PRESMAN, or any representative acting on his behalf, to include, but not limited to, manufacturer catalogs, purchase orders, invoices, and receipts.

3.       All letters constituting, concerning, or relating to efforts to collect co-payments and/or deductibles for individuals that receive health care coverage from Medicare and Medicaid.

4.       All correspondence and cancelled checks relating to notice of overpayment and request for refunds from Medicare.

5.      All correspondence to and from Medicare including, but not limited to, audits (or audits from Medicare contractors), manuals, advisories, newsletters, bulletins, and publications.

6.      All correspondence to and from patients regarding Medicare.

7.      Financial books and records and documents constituting, concerning, or relating to MIKHAIL L. PRESMAN, to include, but not be limited to:

(a).    Bank accounts, money market accounts, checking accounts, including deposits and disbursements, cancelled checks or draft electronic transfers and ledgers.

(b).    Credit card/ATM/debit card accounts.

8.      All contracts, agreements, logs, lists or papers affiliated with any medical professional services, referrals, or storage, to include, but not be limited to, records of payment.

9.      All contracts, agreements or paper affiliated with any outside medical insurance billing company.

all of which constitute evidence, fruits and instrumentalities of violations of Title 18, United States Code, Section 1347 (Health Care Fraud).

10.     Additionally, all computer equipment and items that contains the items listed in paragraphs 1 through 9, inclusive, and pertain to  MIKHAIL L. PRESMAN'S, or related entities', submission of Medicare claims between January 1, 2006 and May 10, 2013, including:

(a).    Computer equipment, including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data.  These devices include but are not limited to any data-processing hardware (such as central processing units, memory typewriters, and self-contained laptop" or "notebook" computers); internal and peripheral storage devices (such as laser disks, fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes,

optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks);

(b).    Information, instructions, programs or program code, stored in the form of electronic, magnetic, optical, or other media which are capable of being interpreted by a computer of its related components, data, data fragments or control characters integral to the operation or computer software, operating system software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended for use to communicate with computer components;

(c).    Any written, recorded, printed or electronically stored material which explains or illustrates the configuration or use of any seized hardware, software, or related item;

(d).    Devices, programs, or data-whether themselves in the nature of hardware of software-that can be used or is designed for use to restrict access to or facilitate concealment of any computer hardware, computer software, computer-related documentation, electronic data, records documents or materials within the scope of this application, any data security hardware (such as any encryption devices, chips and circuit boards), passwords, data security software of information (such as test keys and encryption codes), and similar information that is required to access computer or data or to otherwise render programs or data into a useable form;

(e).    Any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or

computer-related equipment. This media includes but is not limited to any fixed disks, external hard disks, removable hard disk cartridges, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, laser disks, or other memory storage devices;

(f). Any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures and photocopies); any mechanical form (such as phonograph records, printing, or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs), or any information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives and electronic notebooks), as well as printouts or readouts from any magnetic storage device.

(g). Any and all communications previously received or transmitted, or prepared in contemplation of transmission, including electronic mail or data associated with electronic bulletin board systems, stored on any of the electronic media named above. All electronic communications, including those previously received or transmitted, or held in temporary, intermediate storage incident to transmission, documents, and materials, including those used to facilitate communications, as used above shall include any and all communications previously received, transmitted, or stored, or prepared in contemplation of transmission, including electronic mail or data associated with electronic bulletin board systems, whether stored on any of the electronic media named above or held in temporary, intermediate storage incident to transmission to the individuals or premises within the scope of this application.

(h). Any and all electronic information or electronic data, stored in any form, which is used or has been prepared for use either for periodic or random back-up (whether

deliberate or inadvertent, or automatically or manually initiated), or any computer or computer system, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, videocassettes, and other media capable or storing magnetic or optical coding.

(i).    Such electronic data in the form of electronic records, documents, and materials, including those used to facilitate communication;

(j).    "Hidden", erased, compressed, password-protected, or encrypted files;

(k).    "Mainframe" computers, or of "micro" or "personal" computers, either standing alone or joined through a series of connected computers called a "network;"

(l).    All magnetic storage devices as well as the central processing units (CPUs) and applicable keyboards and monitors which are an integral part of the processing unit; and

(m).    Various file "directories" and the individual files they contain, recently deleted data; scanning storage areas for deliberately hidden files,

All information obtained from such computers or storage media will be maintained by the government for the purpose of authentication and any potential discovery obligations in any related prosecution. The information shall be reviewed by the government only for the purpose of identifying and seizing information that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1347 (health care fraud) for the period between January 1, 2006 and May 10, 2013.